855 F.2d 1295
 12 Fed.R.Serv.3d 298, 48 Ed. Law Rep. 1154
 Kalima JENKINS, by her friend, Kamau AGYEI; Carolyn Dawson,
by her next friend, Richard Dawson; Tufanza A. Byrd, by her
next friend, Teresa Byrd; Derek A. Dydell, by his next
friend, Maurice Dydell; Terrance Cason, by his next friend,
Antoria Cason; Jonathan Wiggins, by his next friend,
Rosemary Jacobs Love; Kirk Allan Ward, by his next friend,
Mary Ward; Robert M. Hall, by his next friend, Denise Hall;
Dwayne A. Turrentine, by his next friend, Shelia
Turrentine; Gregory A. Pugh, by his next friend, Barbara
Pugh; Cynthia Winters, by her next friend, David Winters;
on behalf of themselves and all others similarly situated,
and American Federation of Teachers, Local 691, Appellees,
v.
The STATE OF MISSOURI, Honorable John Ashcroft, Governor of
the State of Missouri, Wendell Bailey, Treasurer of the
State of Missouri, Missouri State Board of Education,
Roseann Bentley, Dan Blackwell, Terry A. Bond, President,
Delmar A. Cobble, Grover Gamm, Jimmy Robertson, Robert L.
Welling, Donald E. West, Members of the Missouri State Board
of Education, Arthur L. Mallory, Commissioner of Education
of the State of Missouri, Appellants,
and
School District of Kansas City, Missouri and Claude C.
Perkins, Superintendent thereof, Appellees.
Kalima JENKINS, by her friend, Kamau AGYEI, et al., and
American Federation of Teachers, Local 691, Appellees,
v.
The STATE OF MISSOURI, et al., and School District of Kansas
City, Missouri, et al., Appellees,
Icelean Clark; Bobby Anderton; Eleanor Graham; John C.
Howard; Craig Martin; Gay D. Williams; Kansas City Mantel
& Tile Co.; Coulas & Griffin Insurance Agency, Inc.;
Sharon Dunham; Lindsay K. Kirk; Linda Frazier; Rick
Feierabend; Linda Hollenbeck; James Hollenbeck; Susan
Horseman; and Clifford M. Horseman, Appellants.
Kalima JENKINS, by her friend, Kamau AGYEI, et al., and
American Federation of Teachers, Local 691,
v.
The STATE OF MISSOURI, et al., and School District of Kansas
City, Missouri, et al., Appellees,
Icelean Clark; Bobby Anderton; Eleanor Graham; John C.
Howard; Craig Martin; Gay D. Williams; Kansas City Mantel
& Tile Co.; Coulas & Griffin Insurance Agency, Inc.;
Sharon Dunham; Lindsay K. Kirk; Linda Frazier; Rick
Feierabend; Linda Hollenbeck; James Hollenbeck; Susan
Horseman; and Clifford M. Horseman, Jackson County,
Missouri, Appellants.
Kalima JENKINS, by her friend, Kamau AGYEI, et al., Appellants,
and
American Federation of Teachers, Local 691,
v.
The STATE OF MISSOURI, et al., and School District of Kansas
City, et al., Appellees.
Kalima JENKINS, by her friend, Kamau AGYEI, et al., Appellees,
and
American Federal of Teachers, Local 691,
v.
The STATE OF MISSOURI, et al., and School District of Kansas
City, Missouri, et al., Appellees,
Jackson County, Missouri; William Waris; Bernice J.
Conley; Gary Panetheire; Beverly O. Ross;
Michael Bendergast, their officials, Appellants.
Kalima JENKINS, by her friend, Kamau AGYEI, et al., and
American Federation of Teachers, Local 691,
v.
The STATE OF MISSOURI, et al., Appellees,
and
School District of Kansas City, et al., Appellants.
 Nos. 86-1934, 86-2537, 87-1749, 87-2299, 87-2300, 87-2588,
87-2565, 87-2589, 87-2659, 88-1073 and 88-1456.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 21, 1988.
Decided Aug. 19, 1988.
Rehearings En Banc Denied in Nos. 86-1934, 86-2537, 87-1479,
87-2299, 87-2300, 87-2565, 87-2588, 87-2589,
88-1073 Oct. 14, 1988.
Order on Denial of Rehearings En Banc Oct. 14, 1988.
 
 H. Barow Farr, III, Washington, D.C. for State of Mo.
 Roger Clegg, amicus for U.S.
 Mark Bredemeier, Kansas City, Mo., amicus for Icelean Clark, et al.
 John B. Williams, Kansas City, Mo., for Jackson County.
 Robert T. Stephen, Topeka, Kan., amicus for State of Kan.
 Allen Snyder, Washington, D.C., for Kansas City School Dist.
 Arthur Benson, Kansas City, Mo. and Russell E. Lovell, II, Des Moines, Ia., for Kalima Jenkins.
 Before LAY, Chief Judge, HEANEY and JOHN R. GIBSON, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The Kansas City School District desegregation case is before us again and we now must consider the scope of the remedies ordered by the district court,[1] specifically with respect to magnet schools and capital improvements, and the tax increases authorized to generate the Kansas City, Missouri School District's share of the costs of these programs.[2] We affirm the judgment of the district court with respect to scope of the remedy as to magnet schools and capital improvements with some slight modifications. While we approve the order and conclusions of the district court with respect to the property tax, we modify its future operation to more closely comport with limitations upon our judicial authority, and we reverse that part of the district court's order establishing an income tax surcharge.
 
 
 2
 In this case the district court dealt with undisputed constitutional violations and its series of orders were necessary to remedy the lingering results of these violations, since local and state authorities had defaulted in their duty to correct them. See Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S.Ct. 1267, 1275-76, 28 L.Ed.2d 554 (1971); Brown v. Bd. of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II ).
 
 
 3
 The Supreme Court has provided broad guidelines for the district courts in such cases. In Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II ), the Court set forth a three part analysis of the district court's remedial power:
 
 
 4
 In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. The remedy must therefore be related to 'the condition alleged to offend the Constitution....' Second, the decree must indeed be remedial in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.' Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.
 
 
 5
 433 U.S. at 280-81, 97 S.Ct. at 2757 (citations omitted).
 
 
 6
 Our standard of review of the district court's actions within these limiting legal principles is restricted: "[T]he choice of remedies to redress racial discrimination is 'a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court.' " United States v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) (quoting Fullilove v. Klutznick, 448 U.S. 508, 100 S.Ct. 2758, 2790, 65 L.Ed.2d 902 (1980) (Powell, J., concurring)); United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1236 (2d Cir.1987), cert. denied, U.S. ----, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). We have also recognized the importance of the district court's factual findings, which may not be disturbed unless clearly erroneous. Fed.R.Civ.P. 52(a); Jenkins v. Missouri, 807 F.2d 657, 666-67 (8th Cir.1986) (en banc) (Jenkins I ), cert. denied, --- U.S. ----, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987).
 
 
 7
 Bearing in mind these limitations on the district court's remedial power and on our scope of review, we turn to the constitutional violations identified by the district court.
 
 
 8
 The State has admitted and the district court judicially noticed that Missouri mandated segregated schools for black and white children before 1954. Jenkins v. Missouri, 593 F.Supp. 1485, 1490 (W.D.Mo. Sept. 17, 1984). KCMSD established and maintained segregated facilities with segregated staffs. There are still vestiges of the dual school system lingering in KCMSD, and KCMSD and the State have not met their obligations to disestablish that system. 593 F.Supp. at 1504.
 
 
 9
 The district court further found that "the inferior education indigenous of the state-compelled dual school system has lingering effects in the Kansas City, Missouri School District." 593 F.Supp. at 1492. "[W]itnesses confirmed the conclusion reached by the Supreme Court in Brown I [Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ] that forced segregation ruins attitudes and is inherently unequal * * *. The general attitude of inferiority among blacks produces low achievement which ultimately limits employment opportunities and causes poverty." 593 F.Supp. at 1492 (citations to the record omitted). "Segregation has caused a system wide reduction in student achievement in the schools of the KCMSD." Jenkins v. Missouri, 639 F.Supp. 19, 24 (W.D.Mo.1985) (citations to record omitted) (emphasis in original).
 
 
 10
 The district court found that segregation in KCMSD caused the departure of the whites in the system to private schools and to the suburbs. Order of Aug. 25, 1986, slip op. at 1-2. See also Order of November 12, 1986, slip op. at 3. During the years between Brown I and trial, the enrollment of KCMSD shifted from predominantly white to predominantly black. In the 1958-59 school year, blacks constituted 22.5% of KCMSD enrollment, but by 1983-84 enrollment was 67.7% black and white enrollment had dropped 80%. 593 F.Supp. at 1495. "[A]s of 1974, 20 years after Brown I, 39 schools were more than 90% black * * *. Eighty percent of all blacks in the District attended schools that were 90% black * * *." Id. at 1492-93. KCMSD later reduced the number of over-90%-black-enrollment-schools, but the district court found in 1984 that KCMSD had still not completely dismantled the dual system. Id.
 
 
 11
 In discussing KCMSD's school buildings the district court made the stark finding that "[KCMSD's] physical facilities have literally rotted." Jenkins v. Missouri, 672 F.Supp. 400, 411 (W.D.Mo.1987). Specifically, the court found that "the overall condition of the KCMSD school buildings, particularly the interiors, is generally depressing and thus adversely affects the learning environment and continues to discourage parents who might otherwise enroll their children in the KCMSD." Id. at 403 (citations to record omitted). The district court found there were "numerous health and safety hazards, educational environment hazards, functional impairments, and appearance impairments" in the KCMSD's facilities, and catalogued examples of these problems and the evidence of them before the court. Id. at 403.
 
 
 12
 The district court made findings that both KMCSD and the State had caused the decay of the KCMSD's buildings. The court specifically found that "even if the State * * * did not directly cause the deterioration of the school facilities, it certainly contributed to, if not precipitated, an atmosphere which prevented the KCMSD from raising the necessary funds to maintain its schools." Order of November 12, 1986, slip op. at 4; accord, 672 F.Supp. at 403.
 
 
 13
 In response to these findings of vestiges of unconstitutional segregation, the court ordered remedial programs involving magnet schools and capital improvements.
 
 
 14
 The magnet plan provided that by 1991-92 every high school and middle school in the KCMSD and about half the elementary schools would become magnet schools with one or more distinctive themes, such as foreign languages, performing arts, and math and science. Order of Nov. 12, 1986, slip op. at 2. The elementary magnets were to be located at selected sites throughout KCMSD, with at least one magnet in each area of the KCMSD.[3]
 
 
 15
 The district court also ordered a capital improvements program for KCMSD totaling some $260 million.[4] The principal capital improvement plan called for the closing of some eighteen KCMSD school facilities, construction of seventeen new facilities and renovation of others. 672 F.Supp. at 405. The portion of the plan the court ordered to be funded is scheduled for completion by the fall of 1990. Id.
 
 
 16
 In considering its final capital improvement order the district court gave specific attention both to KCMSD's proposal and the State's alternate proposal calling for approximately $61 million in renovations. Id. at 403-05. It rejected the State's recommendations as an inadequate "patch and repair" approach which would not serve the remedial goals established by the court, id. at 404, and concluded that the limited renovation the State proposed would result in the schools continuing to be "unattractive and substandard, and would certainly serve as a deterrent to parents considering enrolling their children in KCMSD schools." Id. at 405.
 
 
 17
 To enable KCMSD to fund its share of the costs of the desegregation plan, the district court imposed a 1.5 percent surcharge on income of residents and non-residents of KCMSD subject to the Missouri State income tax "for work done, services rendered and business or other activities conducted within the KCMSD." Jenkins, 672 F.Supp. at 412. The court also ordered the district's property tax levy to be increased to $4 per $100 assessed valuation through the 1991-92 fiscal year, and authorized KCMSD to issue $150,000,000 in capital improvement bonds, to be retired within twenty years. Id. at 413.
 
 I.
 
 18
 The district court's remedial orders were based on the elementary principle that the victims of unconstitutional segregation must be made whole, and that to make them whole it will be necessary to improve their educational opportunities and reduce their racial isolation. The foundation of the plans adopted was the idea that improving the KCMSD as a system would at the same time compensate the blacks for the education they had been denied and attract whites from within and without the KCMSD to formerly black schools. See Order of June 16, 1986, slip op. at 17. The long term goal of the district court's effort was therefore:
 
 
 19
 to make available to all KCMSD students educational opportunities equal to or greater than those presently available in the average Kansas City, Missouri metropolitan suburban school district. In achieving this goal the victims of unconstitutional segregation will be restored to the position they would have occupied absent such conduct, while establishing an environment designed to maintain and attract non-minority enrollment.
 
 
 20
 Id. (emphasis added); accord, 639 F.Supp. at 54.
 
 
 21
 In later orders the district court explained how the magnet school and capital improvement plans would bring about these ultimate objectives. The court found "that the proposed magnet plan would generate voluntary student transfers resulting in greater desegregation in the district schools." Order of November 12, 1986, slip op. at 3. The court specifically stated:
 
 
 22
 [T]he plan would provide both minority and non-minority district students with many incentives to leave their neighborhoods and enroll in the magnet schools offering the distinctive themes of interest to them. Most importantly, the Court believes that the proposed magnet plan is so attractive that it would draw non-minority students from the private schools who have abandoned or avoided the KCMSD, and draw in additional non-minority students from the suburbs.
 
 
 23
 Id.
 
 
 24
 The district court thus articulated three remedial goals needed to restore the victims to the position they would have occupied without the State and KCMSD's constitutional violations: first, to improve the educational lot of the victims of unconstitutional segregation; second, to regain some portion of the white students who fled the district and retain those who are still there; and third, to redistribute the students within the KCMSD to achieve the maximum desegregation possible.
 
 
 25
 The State argues that the goal of attracting non-minority students from private schools and suburban schools is not warranted by the nature of the constitutional violation unless KCMSD and the State committed a specific violation causing students to withdraw from the system. The State argues that under Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I ), a court remedying an intradistrict violation must simply strive to distribute students within the district evenly by race. But this court has held in Jenkins I, 807 F.2d at 683-84, and Liddell v. Missouri, 731 F.2d 1294, 1302-08 (8th Cir.) (en banc) (Liddell VII ), cert. denied, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984), that voluntary interdistrict remedies may be used to make meaningful integration possible in a predominantly minority district.
 
 
 26
 These holdings are bolstered by the district court's findings that the preponderance of black students in the district was due to the State and KCMSD's constitutional violations, which caused white flight. The district court found that the existence of segregated schools led to white flight from the KCMSD to suburban districts and to private schools.[5] E.g., Order of Aug. 25, 1986, slip op. at 1-2. See also Order of November 12, 1986, slip op. at 3. This finding is implicitly recognized in the court's remedial orders with the express goal of attracting back the students who had left KCMSD schools.
 
 
 27
 These findings that the unconstitutional segregation caused the KCMSD to lose certain students form the basis for a remedy designed to attract such students back. Without regaining those students who have already fled, the desegregation effort in this case will take place in a school district with a preponderance (roughly 70%) of black students, despite its majority white population. Under such circumstances, the State's position would effectively defeat any possibility of meaningful integration.
 
 
 28
 The State argues that any consideration of white flight to the suburban districts runs contrary to our earlier holdings and to earlier findings of the district court. These arguments simply miss the mark. Jenkins I dealt with white flight in the context of a claim for interdistrict relief. We first note that three judges of this court would have found an interdistrict violation, 807 F.2d at 696 (Lay, C.J., dissenting), and that the four judges that concluded there was not such a violation concluded that KCMSD's segregation had no substantial segregative effect in the SSD's. See id. at 680-81. This finding concerning segregation in the SSD's is not inconsistent with a further finding that KCMSD's segregation caused it to lose significant numbers of its white students and that regaining those students is a necessary part of restoring the victims to the condition they would have enjoyed had there been no constitutional violation.
 
 
 29
 The State further argues that it cannot be responsible for the voluntary departure of white students from the school district and that white flight "is usually a reaction to just the sort of change that federal courts seek to implement." State's Reply Brief at 9. This argument does not necessarily contradict the district court's findings that state-imposed segregation caused white flight and that the failure to eliminate the vestiges of discrimination contributed to the decline in the educational quality and physical plant of the KCMSD school system. In any event, such court-ordered integration would not have been necessary had the State not unconstitutionally mandated a dual school system and then failed to eliminate the vestiges of segregation.
 
 
 30
 The State also attacks the goal of improving the education of all KCMSD students, arguing that this remedial goal exceeds the scope of the violation, because it seeks to benefit all KCMSD students, not just those minority students who have suffered from the effects of the constitutional violations. Careful reading of the district court's order shows that the court did not view improving education for all KCMSD students as an end in itself, but as a means to serve the goals of restoring to the victims the education they have been denied and of attracting and maintaining whites in the KCMSD. See Order of June 16, 1986, slip op. at 17 (language quoted at p. 11, supra ); 639 F.Supp. at 54. We cannot say that the district court abused its discretion in using system-wide educational enhancements to accomplish its legitimate desegregative objectives. Moreover, this court has approved remedial programs for the benefit of all students in a district where the children have been deprived of the right to a desegregated education. See Little Rock School District v. Pulaski County Special School District No. 1, 839 F.2d 1296, 1308 (8th Cir.1988).
 
 
 31
 The State next argues that the findings of the district court do not identify statistics for student enrollment that would indicate that KCMSD had become a unitary school district. The State argues that without such findings, there can be no objective evaluation of whether the plans ordered are well-crafted to achieve unitariness.
 
 
 32
 The State's argument would have more force if we dealt only with a question of student assignment. We have before us a system-wide desegregation remedy involving magnet schools and capital improvements that is planned for completion over a five year period. One of the most complex questions in desegregation litigation is that of when a district has become unitary. We decline to give an advisory opinion on that issue, but leave it for consideration when the programs planned through the 1991-92 year have been implemented.
 
 
 33
 Next, the State argues that the magnet school plan adopted by the district court does not serve the court's avowed goals. These arguments attack the district court's factual findings and therefore must be reviewed under the clearly erroneous standard.
 
 
 34
 First, the State contends that the extent of magnet schools ordered exceeds the amount necessary to achieve uniform distribution of minority and majority race students at schools within the district, or even disserves the goal of uniform distribution.
 
 
 35
 The State argues that the plan simply includes too many magnet schools--that it is extravagant. The district court specifically addressed the State's concern over making magnet schools of all the senior high and middle schools and half the elementary schools. It observed that in the ordinary magnet plan, because of limitations on the number of students who may be enrolled, "for each non-minority student who enrolls in the magnet school a minority student, who has been the victim of past discrimination, is denied admittance." Order of Nov. 12, 1986, slip op. at 3. It found that "[w]hile these plans may achieve a better racial mix in those few schools, the victims of racial segregation are denied the educational opportunity available to only those students enrolled in the few magnet schools. This results in a school system of two-tiers as it relates to the quality of education. This inequity is avoided by the KCMSD magnet school plan." Id. The State in its filings with the district court cautioned about creation of a two-tiered system of schools in which "existing schools are, or are perceived to be, markedly inferior." Response of State to KCMSD motion for approval of 1986-87 magnet programs, p. 12. The State's expert witness, Dr. Doyle, echoed this concern and suggested that one way to avoid the problem was to convert an entire school system to magnet schools. Tr. 376, 381-82, June 5, 1986. Another State's witness, Dr. Cooper, also agreed on cross-examination that the comprehensiveness of the plan was a step in the right direction. Tr. 890, Sept. 18, 1986. The district court's finding regarding the need for the number of magnet schools authorized by the plan is amply supported by the State's own evidence.
 
 
 36
 The State also argues that by locating magnet schools within white neighborhoods as well as black neighborhoods, the plan will defeat integration by allowing children to attend magnet schools within their own neighborhoods. The plan was fashioned to prevent such a result. The plan offers different themes in numerous elementary schools in the district, some located close to suburban areas and others in heavily minority residential districts. The various schools should therefore draw students from all parts of the district and increase the desegregative opportunity. The plan builds upon this by providing middle and high school magnet programs, giving those attending elementary school magnets a strong incentive to stay in the district throughout their school years. The State's expert, Dr. Doyle, agreed that this feeder pattern would be desegregative. Tr. 808, Sept. 18, 1986.
 
 
 37
 The State also attacks the district court's findings that the magnet plan will provide schools that are attractive to whites not currently attending KCMSD schools. Order of Nov. 12, 1986, slip op. at 3. However, the State has pointed to no evidence in the record persuading us that this finding is clearly erroneous.
 
 
 38
 We conclude that the district court's finding that the magnet plan was properly designed to achieve voluntary desegregation is not clearly erroneous.
 
 II.
 
 39
 The State attacks the scope of the capital improvements plan and argues that the plan was not fashioned to further the court's remedial goals.[6]
 
 
 40
 The district court found that the capital improvements program "is a proper remedy through which to remove the vestiges of racial segregation, and is needed to attract non-minority students back to the KMCSD." Order of November 12, 1986, slip op. at 4. Moreover, because unconstitutional segregation was in part responsible for the decay of KCMSD's buildings, capital improvements were necessary to restore the victims to their rightful place. Id.
 
 
 41
 The State argues that the district court strayed from the dictates of Milliken II by failing to show that the State's constitutional violations caused the condition which the capital improvement programs were meant to remedy. It argues that the decay in KCMSD's schools occurred because KCMSD was unable to raise funds for maintenance from its taxpayers, and the district court made no findings that the voting by KCMSD voters was discriminatory, or that the State is legally responsible for the voting patterns. Thus, according to the State, the district court required it to remedy problems of decay that were not caused by the State's constitutional violations.
 
 
 42
 There are ample findings supporting the district court's conclusion that the State is partly to blame for the decay of KCMSD's facilities. The district court found that the State by its constitutional violations and failure to remove the vestiges of the dual school system "contributed to, if not precipitated, an atmosphere which prevented the KCMSD from raising the necessary funds to maintain its schools." Order of November 12, 1986, slip op. at 4. It had earlier found that such lack of maintenance was "further evidence of the detrimental effects that segregation has had on this school district's ability to raise adequate resources." 639 F.Supp. at 41.
 
 
 43
 The State argues that the lack of funding of KCMSD is simply independent action of the voters of KCMSD for which the State may not be liable. But there is support in the record for the court's findings that segregation and the failure to remove the vestiges of the dual school system contributed to the atmosphere preventing KCMSD from raising necessary funds. The findings of fact demonstrate a spiraling effect of white children leaving KCMSD schools and KCMSD's white constituency withdrawing its financial support from the system. This process eventually caused the decay of KCMSD's school buildings, which in turn fed the cycle.[7]
 
 
 44
 Further, this argument advanced by the State attacks an aspect of the court's findings that was merely an alternative basis for its conclusion. The district court also found:
 
 
 45
 The improvement of school facilities is an important factor in the overall success of this desegregation plan. Specifically, a school facility which presents safety and health hazards to its students and faculty serves both as an obstacle to education as well as to maintaining and attracting non-minority enrollment. Further, conditions which impede the creation of a good learning climate, such as heating deficiencies and leaking roofs, reduce the effectiveness of the quality education components contained in this plan.
 
 
 46
 639 F.Supp. at 40. Even absent the findings that the State contributed to causing the decay, the capital improvements would still be required both to improve the education available to the victims of segregation as well as to attract whites to the schools.
 
 
 47
 In Jenkins I, we held that the district court's findings were sufficient to support its conclusion that capital improvements are necessary for successful desegregation. 807 F.2d at 685. We specifically recognized the findings that "conditions which impede the creation of a good learning climate * * * reduce the effectiveness of the quality education components contained in this plan." Id. (quoting Order of June 14, 1985 at 34).
 
 
 48
 Similarly, in Liddell VII, 731 F.2d at 1318-19, we affirmed an order requiring the State to pay one-half of the cost of a capital improvements program necessary to restore city facilities to a constitutionally acceptable level. The State filed a petition for certiorari directed to this issue, which was denied.[8] See Petition for Certiorari at 24-28, Missouri v. Liddell, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984).
 
 
 49
 The State further argues that the facility improvements are more than is necessary to carry out the educational components of the desegregation plan. However, the district court found that the overall condition of the school buildings "adversely affects the learning environment and continues to discourage parents who might otherwise enroll their children in the KCMSD." 672 F.Supp. at 403. The district court catalogued the poor conditions prevailing in KCMSD's school buildings. Id.; 639 F.Supp. at 39-40. Certainly defective lighting, inadequate heating, stench from toilet facilities, and other conditions affecting the appearance of the schools and comfort of the students affect not only the quality of education that may be obtained there, but also whether parents will withdraw their children from such schools or reenroll them there.
 
 
 50
 Finally, the State attacks certain aspects of the capital improvements plan as extravagant. We have examined the many instances the State points out and conclude there was substantial testimony demonstrating the justification for these portions of the plan. We mention only one example of the State's objections. The State objected to a 25 acre farm and 25 acre wildland area that had been ordered for the magnet schools. State's Brief at 56. However, a similar twenty-three acre museum and laboratory in a science program at Shawnee Mission South High School in Shawnee Mission, Kansas (which lies approximately a mile to the west of the southern portion of KCMSD) was recently commended by Secretary of Education William J. Bennett. James Madison High School, A Curriculum for American Students 34 (1987). The findings of the district court demonstrate that the capital improvements program is essential to assure the quality of education and future success of the magnet schools necessary to remedy the constitutional violations in KCMSD.
 
 
 51
 From materials that have been filed with us concerning the financial needs of the KCMSD, it is apparent that the capital improvements plan that we affirm today does not cover all expenditures that may be necessary between now and the 1991-92 school year, specifically some $16 million for land acquisition and asbestos removal costs. We are informed by the post-argument filings that KCMSD's bond issue has been sold, and that the net proceeds are in the hands of the district. Presumably, these funds will produce substantial interest income before all will be expended in the renovation and construction program. The State is entitled to a determination of the extent of its liability through the 1991-92 fiscal year, and we conclude that the approximately $150,000,000 which is the State's share of capital improvements should be the limit of its contribution for capital expenditures for that period. When the second phase of the capital improvements program is to be considered, we hope that the parties will be able to agree upon a further plan. If they are not, the district court will then be in position to evaluate the success of the program that we have affirmed today and determine what further steps are necessary to remedy the constitutional violations and what further contributions from the State may be required. We observe that the present estimate of the phase two capital improvement program is in the $200 to $300 million range. Any issues regarding this program will simply have to be resolved in the future, as more information is developed.
 
 III.
 
 52
 The State also argues that the capital improvements ordered by the district court violate the eleventh amendment "by requiring payment measured by past activities." In the State's view, the orders measure liability and require payments on the basis of actions taken "at a time when [the State] was under no court-imposed obligation to conform to a different standard." Edelman v. Jordan, 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). The State contends that the capital improvements orders are therefore "little different, in practical terms, from a requirement that the State pay over to the KCMSD all the funds that the district would have raised from successful [tax or bond] proposals," State's Brief at 50, or "an order to pay the KCMSD for the lost value of the deteriorated buildings." State's Brief at 26. Relying principally on Edelman, 415 U.S. at 668, 94 S.Ct. at 1358; Papasan v. Allain, 478 U.S. 265, 106 S.Ct. 2932, 2942, 92 L.Ed.2d 209 (1986); and Miener v. Missouri, 673 F.2d 969, 982 (8th Cir.), cert. denied, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982), the State concludes that the capital improvements orders are an award of retroactive relief, barred by the eleventh amendment.
 
 
 53
 This argument is without merit. The orders for capital improvements were made necessary in large part by the State's past actions, e.g., Jenkins, 672 F.Supp. at 403, and the extent of relief ordered was "determined by the nature and scope of the constitutional violation[s]," Milliken II, 433 U.S. at 280, 97 S.Ct. at 2757, including the State's past violations, e.g., Jenkins, 672 F.Supp. at 403. The orders nonetheless operate prospectively "to wipe out continuing conditions of inequality" produced by Kansas City's dual school system and are therefore valid under the eleventh amendment. Milliken II, 433 U.S. at 290, 97 S.Ct. at 2762. Specifically, the capital improvements orders require the State to participate with the school district in funding planned renovation and construction projects which the district court determined, in findings we uphold today, to be necessary to remedy the continuing effects of state-imposed segregation in Kansas City. See id. at 289-90, 97 S.Ct. at 2761-62; Swann, 402 U.S. at 15, 91 S.Ct. at 1275-76. The relief granted to the school children in the form of improved physical facilities is wholly prospective in nature, requiring "payment of state funds * * * as a necessary consequence of compliance in the future with a substantive federal question determination * * *." Edelman, 415 U.S. at 668, 94 S.Ct. at 1358, quoted in Milliken II, 433 U.S. at 289, 97 S.Ct. at 2762. The relief is readily distinguishable from the award of retroactive payments for withheld disability benefits in Edelman, 415 U.S. at 663-64, 94 S.Ct. at 1355-56, the claim for restoration of a depleted trust corpus and lost income in Papasan, 106 S.Ct. at 2942, or the claim for compensatory educational services under the Education of the Handicapped Act, 20 U.S.C. Secs. 1401-1485 (1982), in Miener, 673 F.2d at 982. The eleventh amendment does not bar the capital improvements ordered by the district court.
 
 
 54
 An argument essentially identical to the State's was rejected by the Supreme Court in Milliken II, 433 U.S. at 288-90, 97 S.Ct. at 2761-62. The State attempts to distinguish Milliken II by arguing that the program involved there was "narrowly tailored to the needs of particular students and necessary to the successful movement of students from minority schools to desegregated schools," whereas the programs involved here "simply make up for all the cumulative effects of past neglect." This argument is in essence a restatement of the State's position that the capital improvements ordered by the district court are not necessary to achieve desegregation--a position which we have already rejected on the basis of the district court's findings.
 
 IV.
 
 55
 The State also argues that the district court erred in its allocation of costs between KCMSD and the State. In Jenkins I, 807 F.2d at 684-86, we determined that the district court order apportioning costs should be modified to reflect our decision in Liddell VII that funding be equally divided between the State and the school district, because the order contained no findings regarding the relative responsibility of the State and KCMSD for these costs. 807 F.2d at 684, 685. The State argues that this determination of 50-50 responsibility should continue to govern.
 
 
 56
 Following our earlier decision, the district court gave further consideration to the allocation of costs, particularly with reference to magnet schools. The district court recognized that the State had created the dual school system, and that KCMSD was required to implement this system under Missouri law. It observed that both the State and KCMSD had failed to eliminate the vestiges of this system. The court reasoned that "the person who starts the fire has more responsibility for the damages caused than the person who fails to put it out." Order of July 6, 1987, slip op. at 13. The court observed that the Missouri Supreme Court had adopted the Uniform Comparative Fault Act in Gustafson v. Benda, 661 S.W.2d 11 (Mo.1983) (en banc). Order of July 6, 1987, slip op. at 14. The district court also noted KCMSD's inability to fund more than twenty-five percent of the costs of the entire remedial plan. Id. at 14. The court therefore concluded that the State was responsible for seventy-five percent of the costs of desegregation, and KCMSD for twenty-five percent.[9]
 
 
 57
 Allocation of costs is part of the remedial power of the district court. United States v. Bd. of School Commissioners, 677 F.2d 1185, 1186 (7th Cir.), cert. denied, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). Our earlier order did not foreclose the district court's further consideration of the issue, and we are satisfied that the district court did not abuse its discretion in making this allocation, nor was its factual determination as to percentages of fault clearly erroneous. We have in other desegregation cases approved varying percentages of contribution, including allocating to the state 100 percent of the costs in certain portions of the plans. Little Rock School Dist. v. Pulaski County Special School Dist. No. 1, 778 F.2d 404, 435-36 (8th Cir.1985); Little Rock School Dist., 839 F.2d at 1306-09. Other courts have similarly placed more than 50 percent of the cost on the State. See, e.g., Bradley v. Milliken, 540 F.2d 229, 246 (6th Cir.1976), aff'd, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (seventy-five percent of the cost of purchasing school buses placed on state). The district court was aware of the serious limitations on KCMSD's capability of raising revenue. Its observation that the State has adopted a comparative fault system had substantial relevance in its determination. We affirm the allocation of costs based upon the further findings of the district court and conclude that our earlier decision en banc did not bar such determinations.
 
 V.
 
 58
 The orders of the district court raising the KCMSD property tax levy and imposing a state income tax surcharge are targets of the State's appeal and an appeal filed by Jackson County, Missouri. The county's appeal is directed particularly to the temporary restraining order and preliminary injunction requiring its officials to collect the property tax levy, and the permanent injunction entered on January 7, 1988. We have also accepted numerous amicus briefs on this issue.[10]
 
 
 59
 In addressing the funding of KCMSD's share of the remedy, the district court found "that the KCMSD is unable with its present resources to raise revenues to fund its share of the costs assessed under the desegregation orders." Jenkins, 672 F.Supp. at 411. The court also found that "[t]he KCMSD has exhausted all available means of raising additional revenue, including presenting a bond issue in 1987 and tax levy increase proposals to the voters in four separate elections in 1986 and 1987." Id. The court noted that it had encouraged the Missouri General Assembly to consider legislation affording the district more versatility to raise funds to support a desegregation program, and found that such legislation had been introduced, was received unfavorably, and ultimately failed. Id. The court concluded that it had explored all the alternatives set forth in Liddell VII, 731 F.2d at 1319-23, and that it was "left with no choice but to exercise its broad equitable powers and enter a judgment that will enable the KCMSD to raise its share of the cost of the plan * * *." Jenkins, 672 F.Supp. at 411.
 
 
 60
 The district court ordered the property tax levy to be increased to $4 per $100 assessed valuation through the 1991-92 fiscal year, and authorized KCMSD to issue $150,000,000 in capital improvement bonds, to be retired within twenty years. Id. at 413.[11] In its October 27, 1987 order, it earmarked the proceeds of the property tax increase for retirement of capital improvements bonds, with any excess to be used to fund other desegregation costs. At the end of the 1991-92 fiscal year, only that portion of the increase necessary to maintain payments on the bonds was to remain in effect until either the bonds were retired or other provisions were adopted to insure retirement. Order of October 27, 1987, slip op. at 2.
 
 
 61
 The district court also imposed a 1.5 percent surcharge on income of residents and non-residents of KCMSD subject to the Missouri State Income Tax "for work done, services rendered and business or other activities conducted within the KCMSD." Jenkins, 672 F.Supp. at 412. The State Department of Revenue was required to collect the tax, and KCMSD was required to publish legal notice of the increase. Those legally responsible for withholding the state income tax are also required to withhold the surcharge. The court initially designated the revenue for use to retire capital improvement bonds, but removed this limitation in its October 27 order.
 
 
 62
 The court based its power to order tax increases and bond issuances to remedy constitutional violations on Liddell VII, 731 F.2d at 1322, and Griffin v. School Bd., 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964). Jenkins, 672 F.Supp. at 411-12.
 
 
 63
 The State and amici argue that the district court exceeded its judicial authority in imposing the property tax increase and income tax surcharge, invaded legislative authority in doing so, and violated the Tenth Amendment, the doctrine of separation of powers, and principles of comity. In addition, they attack this court's en banc decision in Liddell VII, argue that later decisions limit it, and urge distinctions between the issues presented in this case and the Supreme Court's holding in Griffin.
 
 A.
 
 64
 We first deal with a number of general arguments offered by the State and amici, based on the constitutional foundations of judicial power. They first offer an historical argument, relying on a number of The Federalist Papers, particularly number 78, which states that "[t]he judiciary * * * has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever." The Federalist No. 78 (A. Hamilton) (H. Lodge ed. 1888). While Hamilton stressed the weakness of the judiciary, we do not believe The Federalist advocates judicial impotence. Hamilton also stated that the complementary limitations on legislative authority "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." Id.
 
 
 65
 For the most part the arguments of the State and amici either ignore the constitutional violations that the district court found and we have affirmed, or would render the courts powerless to redress such violations. The judiciary's power to determine the rights and liabilities of parties in cases arising under the Constitution and laws of the United States is beyond question, and this power is without purpose if it does not carry with it the power to determine a remedy. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 162-63, 166-67, 176-80, 2 L.Ed. 60 (1803).
 
 
 66
 We may also dismiss summarily the State's related arguments based on the tenth amendment and the principle of separation of powers. These doctrines simply have no bearing on the district court's options in enforcing its judgment. In Milliken II, 433 U.S. at 291, 97 S.Ct. at 2762-63, the Supreme Court rejected the argument that a school desegregation remedy violated the tenth amendment, stating: "The Tenth Amendment's reservation of nondelegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment." The Court has likewise stated that "the separation-of-powers principle * * * has no applicability to the federal judiciary's relationship to the States." Elrod v. Burns, 427 U.S. 347, 352, 96 S.Ct. 2673, 2679, 49 L.Ed.2d 547 (1976) (plurality opinion by Brennan, J.).
 
 
 67
 The State's argument on principles of federal/state comity is a matter of more concern to us, but we will deal with it as we discuss the specific issues before us.
 
 B.
 
 68
 This panel does not write on a clean slate with respect to the property tax issue. The court en banc has held that "the district court's broad equitable powers to remedy the evils of segregation include a narrowly defined power to order increases in local tax levies on real estate. Limitations on this power require that it be exercised only after exploration of every other fiscal alternative." Liddell VII, 731 F.2d at 1320.
 
 
 69
 We enumerated in Liddell VII three inquiries necessary in determining whether fiscal alternatives are unavailable or insufficient to finance a desegregation order: first, what amount of money is necessary to fund the order; second, whether the school board is able with its resources to fund its share of the costs; and third, whether the school board has considered alternative sources of revenue, such as the submission of a referendum or legislative authorization for the board to impose other taxes. Finally, if such alternatives fail and the board and the State as joint tortfeasors are unable to agree on an alternative method of funding, then the district court must conduct an evidentiary hearing and enter a judgment sufficient to cure the constitutional violations found. Id. at 1323.
 
 
 70
 The district court in this case carefully followed the requirements of Liddell VII. See Jenkins, 672 F.Supp. at 411. Voluminous materials were filed with the court before entry of the order, and the parties specifically waived their right to an evidentiary hearing on this issue. In 1986 and 1987 KCMSD submitted four levy increase and one bond referenda, all of which failed, and unsuccessfully sought legislative authorization for additional funding methods.[12] This fully satisfies Liddell, and we should require no more. We do not agree with the dissent's suggestion that we place the entire funding burden on the State under the principle of joint and several liability, leaving the State to its contribution remedy. This would simply prolong the controversy, rather than resolving this already lengthy litigation, and would, in the end, meet the same obstacle the district court faced--the fact that KCMSD's contribution can only come from additional taxes or authorization of new sources of revenue.
 
 
 71
 Liddell VII explored in detail the support for its conclusion that a district court may order a property tax increase in such circumstances, including Griffin v. School Bd. and United States v. Missouri, 515 F.2d 1365 (8th Cir.) (en banc), cert. denied, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975). In Griffin, the Supreme Court held that a district court could enjoin county authorities from paying tuition grants and giving tax credits while its public schools remained closed to avoid desegregation and, "if necessary to prevent further racial discrimination, require the Supervisors to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain without racial discrimination a public school system * * * like that operated in other counties in Virginia." 377 U.S. at 233, 84 S.Ct. at 1234. In United States v. Missouri, three St. Louis suburban school districts were consolidated and the tax rate for the consolidated district was set at the rate of the higher of the three districts. 515 F.2d at 1371-73. There, we "also acknowledged the district court's remedial power to require a tax levy in excess of that authorized by the voters." Liddell VII, 731 F.2d at 1320 (citing United States v. Missouri, 515 F.2d at 1371-72).[13]
 
 
 72
 The State and amici primarily attack Liddell VII by raising questions about its underpinnings, particularly by arguing that Griffin and United States v. Missouri only authorize a court to order the levy of taxes that have already been authorized by state law or to invalidate state action taken in resistance to a desegregation order.
 
 
 73
 The decision of the court en banc in Liddell VII is the law of this circuit, binding on this panel, and requires that we affirm the district court's order with respect to the property tax increase. Liddell VII analyzed decisions cited by the parties in support of their arguments that the district court lacks power to order a property tax increase, including Evans v. Buchanan, 582 F.2d 750 (3d Cir.1978) (en banc), cert. denied, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278, reh'g denied, 447 U.S. 916, 100 S.Ct. 3004, 64 L.Ed.2d 865 (1980), which it determined to support its ruling,[14] and San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), which it distinguished. Liddell VII, 731 F.2d at 1321-22. Following the decision in Liddell VII, the State of Missouri filed a petition for certiorari raising the propriety of the holding on property taxes, and the petition was denied. Leggett v. Liddell, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984).
 
 
 74
 Judge Clark's order may thus be affirmed solely on the basis of Liddell VII.[15] It is not necessary, however, that we do so, for even without relying on Liddell VII, we believe that the district court's property tax, as modified in this opinion, is within the proper limits on its remedial powers.
 
 
 75
 Among the several sources of funds available to KCMSD under Missouri law, only the tax on real and personal property located within the district is under the school board's control. Substantial limitations are placed on this tax by the state constitution and statutes. The tax levy is limited to $1.25 per $100 of assessed valuation, but a majority of voters may approve a levy of $3.75 per $100. Mo. Const. art. X, Secs. 11(b), 11(c). Any increase above the rate of $3.75 requires approval by two-thirds of the voters. Mo. Const. art. X, Sec. 11(c). Any school construction or repair bonds must also be approved by two-thirds of the voters. Mo.Rev.Stat. Sec. 164.151 (1986).
 
 
 76
 These requirements, particularly the two-thirds vote, have had substantial impact upon KCMSD's financial resources. On June 20, 1969, the district submitted a levy increase of $3.05 above the constitutional $1.25 limit, for a total of $4.30. This was approved by 53 percent of the voters, but failed as it lacked a two-thirds majority. Shortly thereafter, on July 1, 1969, the voters approved by a 63 percent vote a $2.50 increase to make a total levy of $3.75. This increase required only a simple majority and is the last to date approved by the necessary percentage of KCMSD voters. Some six levy increases were submitted between 1970 and 1983. Four received the approval of a simple majority, but all six failed to receive the required two-thirds approval.[16]
 
 
 77
 Exhibits before the district court in Jenkins I reveal that between 1974 and 1982 the levy varied between $4.05 and $3.80. In Jenkins I, 807 F.2d at 686, we observed that the levy in KCMSD was $3.43 per $100. The district court order presently before us finds that the levy has been reduced to $2.05. Jenkins, 672 F.Supp. at 413. This substantial reduction of the levy is due to the operation of additional restrictions imposed by state law.
 
 
 78
 Missouri's Proposition C was adopted by initiative on November 2, 1982. Proposition C allocates one cent on the dollar of the state sales tax to the School District Trust Fund, Mo.Rev.Stat. Secs. 144.700-.701 (1986), to be distributed in accordance with Mo.Rev.Stat. Sec. 163.087 (1986). It reduces the total operating levy in each school district to decrease the revenue received by an amount equal to 50 percent of the previous fiscal year's sales tax receipts. Mo.Rev.Stat. Sec. 164.013 (Supp.1987).[17] In addition, the Hancock Amendment, also adopted by initiative, 1980 Mo.Laws 629, mandates revision of levy rates so that the same amount of tax revenue, adjusted for inflation, will be produced from existing property after reassessment as was produced in the previous year. Mo. Const. art. X, Secs. 16-24; Mo.Rev.Stat. Sec. 137.073 (1986). State-wide reassessment of real estate has been required under Mo.Rev.Stat. Sec. 137.115 (Supp.1987), and the total assessed valuation of property in KCMSD increased from approximately $1.2 billion in 1983 to nearly $1.8 billion in 1987.
 
 
 79
 These changes in state law have imposed a unique fiscal disadvantage on KCMSD, depriving it of the benefit of increases in assessed valuation and diverting nearly one-half of the sales taxes collected in the district to other parts of the state. An exhibit before the district court demonstrated that sales tax collections within KCMSD were $31.2 million, of which only $14.6 million were allocated to KCMSD for school use. As no other funding has been forthcoming, the levy reductions mandated by the Proposition C sales tax and reassessment rollbacks have caused the dramatic reduction of KCMSD's levy to its present level of $2.05. The laws of Missouri have thus erected a complicated structure restricting KCMSD's ability to increase its levy and fund its share of the desegregation remedy.
 
 
 80
 Thus, state law so narrowly circumscribes KCMSD's ability to raise money that, if forced to operate within these limits, the district court would lack power to implement a remedy. The Supreme Court has made it clear that state law limitations cannot hinder a district court from remedying constitutional violations. In North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 45, 91 S.Ct. 1284, 1285-86, 28 L.Ed.2d 586 (1971), Chief Justice Burger, writing for a unanimous Court, stated that "if a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees." See also Milliken I, 418 U.S. at 744, 94 S.Ct. at 3127. "We have likewise held in ordering implementation of a school integration plan that 'the remedial power of the federal courts under the Fourteenth Amendment is not limited by state law.' " United States v. Missouri, 515 F.2d at 1372-73 (quoting Haney v. County Bd. of Educ., 429 F.2d 364, 368 (8th Cir.1970)).
 
 
 81
 Moreover, this general supremacy principle applies in cases concerning state tax laws as well as any other type of state laws. The Supreme Court's citation of Griffin to support this general principle shows that the Court does not view Griffin as limiting federal courts' authority to order taxes to cases where no state law would be violated. In Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823, modified on other grounds sub nom. Washington v. United States, 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979), a district court's decree concerning an Indian treaty required state officials to act contrary to state law limitations on their powers. The Supreme Court cited Swann and Griffin in upholding the district court's powers to order the state officials to take actions contrary to state law:
 
 
 82
 State-law prohibition against compliance with the District Court's decree cannot survive the command of the Supremacy Clause of the United States Constitution. It is also clear that [the state] parties to this litigation * * * may be ordered to prepare a set of rules that will implement the Court's interpretation of the rights of the parties even if state law withholds from them the power to do so. E.g., North Carolina Board of Education v. Swann, 402 U.S. 43 [91 S.Ct. 1284]; Griffin v. County School Board, 377 U.S. 218 [84 S.Ct. 1226].
 
 
 83
 Id. at 695 (other citations omitted). In Washington State, as in this case, there was no suggestion that state law restrictions had been adopted to evade the court's remedial orders.
 
 
 84
 With these precedents, we must reject the State's arguments that the district court's power to raise property taxes under Griffin is limited to cases in which the taxes have been authorized under state law or the state law limitations on a school district's taxing authority are enacted to prevent implementation of a desegregation order.
 
 
 85
 KCMSD has admitted that it violated the Constitution by failing to remove the vestiges of the segregated school system. The district's only method for raising funds is the property tax. Although KCMSD's assessed property value per pupil is higher than that of any other school district in the area, Jenkins I, 807 F.2d at 686, its levy of $2.05 was the lowest in Jackson County. With these considerations and under the precedent of the Supreme Court in Griffin, Swann, and Washington State, and this court in Liddell VII and United States v. Missouri, the district court did not err or abuse its discretion in ordering that the KCMSD property tax levy be increased to allow the district to fund its share of the desegregation remedies. In doing so, it followed clear authority that restrictions and limitations of state law which impede the disestablishing of a dual school system may be set aside to remedy the constitutional violations.
 
 
 86
 The State and amici argue vigorously that the actions of the district court violate the right of the people to vote on an increase in their property taxes. Our holding in United States v. State of Missouri, 515 F.2d at 1372-73, rejected that argument. We have recently addressed similar concerns in Little Rock School Dist., where we stated that "[t]he right most prominently involved here is the right to a public education free of racial discrimination. That right 'may not be submitted to vote; [it] depend[s] on the outcome of no elections.' " 839 F.2d at 1303 (quoting West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185-86, 87 L.Ed. 1628 (1943)). In Haney v. County Bd. of Educ., 410 F.2d 920 (8th Cir.1969), we specifically rejected the argument that orders in a desegregation case were limited by state law requiring consent of the electorate, stating that " '[a] citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be.' " 410 F.2d at 926 (quoting Lucas v. Forty-Fourth Gen. Assembly of Colo., 377 U.S. 713, 736-37, 84 S.Ct. 1459, 1473, 12 L.Ed.2d 632 (1964)).
 
 
 87
 While we affirm the actions that the court has taken to this point, as we deal with an on-going remedy we think it appropriate to consider the procedures which the district court should use in the future. It is here that the arguments of the State and amici concerning principles of federal/state comity have their proper application, as we have expressed a desire to use minimally obtrusive methods to remedy constitutional violations. See Liddell VII, 731 F.2d at 1319-23; United States v. Missouri, 515 F.2d at 1372-73. State law currently requires the KCMSD board to submit its proposed levy to the collection authorities of Jackson County. Mo.Rev.Stat. Sec. 164.011.2 (Supp.1987). Deference should be given to the views of concerned state and local officials and to the working of local tax collection procedures to the extent that they appear compatible with the goals to be achieved. United States v. Missouri, 515 F.2d at 1373. We believe a preferable method for future funding of KCMSD's obligation under the district court's desegregation orders is to authorize the school board to submit a proposed levy to the collection authorities adequate to fund its budget, including its share of the cost of the desegregation programs ordered by the district court. County and state authorities should then be enjoined from applying those Missouri constitutional and statutory limitations that would limit or reduce the levy below the amount submitted by the school board.
 
 
 88
 However, the levy must be subject to some reasonable limitation, taking into consideration rates in neighboring areas. See United States v. Missouri, 515 F.2d at 1372-73. There are several possible approaches for such a limitation. One would be to allow the highest levy approved by any district in Jackson County, which in this case is Lee's Summit with a levy of $4.77. Another approach would be to allow a combination of the highest levies for operating expenses and bonded indebtedness ever approved by KCMSD voters. A third approach would be to allow the average of the highest two or three levies in Jackson County. The levy must, of course, be sufficient to fund the necessary desegregation programs, and we believe that it is best to leave the selection of an appropriate limitation to the district court's discretion.[18]
 
 
 89
 Permitting the school board to determine the amount of its levy (subject to reasonable limits) will give maximum consideration to the views of state and local officials and is least disruptive of existing state laws and procedures. The KCMSD board and county and state officials will be allowed to perform their functions as required by state law. In addition, the district court will be removed from the process of setting the levy, and limited solely to establishing the maximum limit and enjoining enforcement of those provisions of Missouri law that prevent KCMSD from raising the money to remedy the constitutional violations. Obviously, the parties can bring before the district court any objections or problems that may arise in implementing this plan.
 
 
 90
 Finally, we observe that the district court's October 27, 1987 order provided that the property tax increase would be reduced at the end of the 1991-92 fiscal year to generate only the amount necessary to retire the capital improvement bonds, approximately $14.9 million per year. In view of our reversal of the income tax surcharge (and unless new revenue sources are authorized), the increased property tax will be the only revenue source available to fund the desegregation expenses ordered by the district court. Accordingly, the ordered reduction of the property tax cannot be automatically implemented at the end of the 1991-92 fiscal year, and the district court must then evaluate further funding requirements.
 
 
 91
 One issue remains for determination, and that is Jackson County's appeal from the district court's January 7, 1988 order entering a permanent injunction against county officials to collect the property tax. On October 17, 1987, the district court entered a preliminary injunction against the county, holding that it was necessary to carry out the purpose of its lawful authority, and citing Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), and Faubus v. United States, 254 F.2d 797 (8th Cir.), cert. denied, 358 U.S. 829, 79 S.Ct. 49, 3 L.Ed.2d 68 (1958). The court also rejected the county's claim that the Tax Injunction Act, 28 U.S.C. Sec. 1341 (1982), prevented it from entering such an order.
 
 
 92
 This court has already rejected the county's anti-injunction act argument in denying its petition for a writ of prohibition. In re Jackson County, 834 F.2d 150 (8th Cir.1987). The county's argument that it has no connection with the underlying controversy because it is not a party and therefore should not be subject to the injunction is without merit. County officials are entrusted by law with the collection of taxes levied by local school districts. Here the district court entered an order that such taxes be increased and the county refused to adjust the 1987 school tax levy accordingly. The Supreme Court has made clear that "nonparties that interfere with the implementation of court orders establishing public rights may be enjoined." Washington State, 443 U.S. at 692 n. 32, 99 S.Ct. at 3078 n. 32. The county's arguments are utterly lacking in merit and the district court's order enjoining county officials to collect the property tax is affirmed.
 
 C.
 
 93
 The income tax surcharge ordered by the district court involves substantially different considerations. As we have seen, the property tax is the established source of revenue for Missouri school districts, and the basic effect of the district court's order was to set aside levy limitations on this taxing authority. The order with respect to the income tax surcharge is an entirely different matter. The district court defined the precise scope of the surcharge, its effective date, and set forth procedures for its collection by the State and delivery to KCMSD. See Jenkins 672 F.Supp. at 412. We are satisfied that the district court invaded the province of the legislature in ordering this surcharge, and that the order is beyond the power of the district court as outlined in Swann, 402 U.S. at 45, 91 S.Ct. at 1285-86; Griffin, 377 U.S. at 233, 84 S.Ct. at 1234; Liddell VII, 731 F.2d at 1319-23; and United States v. Missouri, 515 F.2d at 1371-73.
 
 
 94
 Those decisions authorize the district court to set aside restrictions or limitations imposed by state law that impede the disestablishment of a dual school system, with appropriate deference to local tax collection procedures and the views of concerned state and local officials. The income tax surcharge fails on both counts. Rather than merely removing the levy limitation on an existing state or local taxing authority, the income tax surcharge restructures the State's scheme of school financing and creates an entirely new form of taxing authority. We believe the district court has exceeded its authority in ordering the collection of school district revenue from an entirely new source, with all funds delivered to one district for a specified purpose.[19] While this income tax surcharge was part of the legislative program KCMSD developed and submitted to the State General Assembly,[20] none of the parties to this litigation seriously urged the district court to adopt it as part of a judicial remedy.
 
 
 95
 We accordingly reverse that part of the district court's order imposing the income tax surcharge. Any unexpended collections must be refunded and the district court is directed to take such action as it deems appropriate with respect to any further refunds. We caution that the constitutional violations must be remedied and the remedies fully funded. Any refund orders must be crafted recognizing this fundamental principle.
 
 D.
 
 96
 In our earlier en banc opinion we made clear that the remedy ordered by the district court must be fully funded. Jenkins I, 807 F.2d at 686. Should the funds that KCMSD can provide for desegregation expenses under today's decision fall short, the remainder must be paid by the State, as the orders of the district court have imposed joint and several liability on the State and KCMSD.[21] See notes 3 & 4, supra. See also Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 260 & n. 8, 99 S.Ct. 2753, 2756 & n. 8, 61 L.Ed.2d 521 (1979); Watts v. Laurent, 774 F.2d 168, 179 (7th Cir.1985), cert. denied, 475 U.S. 1095, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986).
 
 
 97
 The funding provisions that we have affirmed today will continue until further order by the district court, or until KCMSD is able to fund its share of the desegregation remedy or the legislature has made other sources of revenue available for this purpose.
 
 VI.
 
 98
 The Jenkins class and KCMSD appeal from the district court's denial of the class' motion to have Kansas students included as participants in the KCMSD magnet plan. The district court declined to order KCMSD to educate residents of another state, with the State of Missouri paying the costs. The court found that inclusion of Kansas students would be unduly complex. We find no abuse of the district court's discretion in declining to order Missouri to pay to educate residents of another state. As the district court noted, this ruling does not preclude Kansas school districts from participating in a voluntary interdistrict transfer agreement with KCMSD.
 
 VII.
 
 99
 Jackson County, Missouri and Icelean Clark, et al., a group of individual and corporate taxpayers, appeal the district court's October 27, 1987 order denying their applications to intervene as of right.[22] The county filed a renewed motion to intervene on October 7, 1987 and the Clark group moved to intervene on September 25, 1987 to challenge the funding orders of the district court. The district court denied the motions as untimely.
 
 
 100
 Rulings on the timeliness of applications to intervene are committed to the sound discretion of the district court and will not be disturbed on review absent an abuse of that discretion. NAACP v. New York, 413 U.S. 345, 365-66, 93 S.Ct. 2591, 2602-03, 37 L.Ed.2d 648 (1973); Arkansas Elec. Energy v. Middle South Energy, Inc., 772 F.2d 401, 403 (8th Cir.1985). Timeliness is determined from all the circumstances, NAACP v. New York, 413 U.S. at 366, 93 S.Ct. at 2603, but three factors receive particular attention: " 'how far the proceedings have gone when the movant seeks to intervene, prejudice which resultant delay might cause to other parties, and the reason for the delay,' " Arkansas Elec. Energy, 772 F.2d at 403 (quoting Nevilles v. EEOC, 511 F.2d 303, 305 (8th Cir.1975) (per curiam) (citations omitted)).
 
 
 101
 Applying the analytical framework set forth in Nevilles, the district court ruled that the Clark group's September 25, 1987 motion and the county's October 7, 1987 motion were untimely because the court had already determined how KCMSD's portion of the desegregation plan would be funded in its September 15, 1987 order; the appellants had ample opportunity to file timely applications; and intervention at this late stage of the proceedings would unduly delay implementation of the remedy to which the members of the Jenkins class are entitled. Having carefully reviewed the record, we are satisfied that the district court did not err in so ruling.
 
 
 102
 The Clark group argues that their delay in seeking intervention should be excused because they did not have "actual or constructive notice of the District Court's ultimate taxation scheme" before entry of the September 15, 1987 order, and that dismissal of their motion to intervene in such circumstances constitutes a denial of due process. While "absence of knowledge may, under certain circumstances, excuse delay in attempting to intervene," the burden of demonstrating lack of knowledge rests with the persons seeking intervention. EEOC v. Westinghouse Elec. Corp., 675 F.2d 164, 165 (8th Cir.1982) (per curiam); Nevilles, 511 F.2d at 305. The taxpayers have not met this burden. In its June 14, 1985 order, the district court discussed its power to raise taxes to fund the desegregation remedy and enjoined Missouri's "Proposition C" tax levy rollback. Jenkins, 639 F.Supp. at 44-45. The court again enjoined the rollback on August 25, 1985, and in its July 6, 1987 order the district court made clear its intention to fund KCMSD's portion of the remedy through either an earnings tax or state income tax surcharge. These orders were regularly reported by the local news media. Taken together, the orders were more than sufficient to inform the taxpayers of the status of the suit and put them on notice that their interests would be affected by the district court's funding orders. In particular, local property owners in the Clark group had already been affected by the orders enjoining the tax levy rollback. On this basis, the district court did not abuse its discretion in concluding that the taxpayers' motion to intervene was untimely. Cf. NAACP v. New York, 413 U.S. at 366-67, 93 S.Ct. at 2603-04; EEOC v. Westinghouse, 675 F.2d at 166; Nevilles, 511 F.2d at 306. As the taxpayers had fair notice of the action and were allowed to participate as amici curiae by the district court, their due process argument is also without merit.
 
 
 103
 Jackson County argues that its motion was timely because it originally sought to intervene in an application filed on April 15, 1985, which "made the district court aware of its interest in any order dealing with tax increases" well before the September 15, 1987 funding order. While the county's April 15, 1985 motion was filed with the district court, there is no proof that the motion was served on the parties, as Fed.R.Civ.P. 24(c) requires. The certificate of service accompanying the motion is not signed and none of the parties filed responses to the motion or otherwise indicated that they had received it. Thereafter, for a period of nearly two and one-half years, the county failed to take any action to intervene until the filing of its October 7, 1987 motion. During this period, as we have said, the district court issued a series of highly publicized orders which gave the county, like the taxpayers, ample notice of the course of the action and the fact that the county's interest as local property tax collector would be affected by the district court's funding orders. The county's two and one-half year delay in pursuing its motion to intervene was sufficient to justify the district court in treating the motion as having been filed on October 7, 1987 and ruling it untimely on that basis. See McCarthy v. Kleindienst, 741 F.2d 1406, 1415-16 (D.C.Cir.1984).
 
 
 104
 The district court did not err in denying the motions of the Clark group and Jackson County to intervene.[23]VIII.
 
 
 105
 We affirm the judgment of the district court with respect to the scope of the remedy. We also affirm its orders with respect to the property tax, but remand for further modifications as provided in this opinion. We reverse the judgment of the district court with respect to the income tax surcharge and stay any further collection. Finally, we affirm the order of the district court denying the motions of the Clark group and Jackson County to intervene.
 
 
 106
 LAY, Chief Judge, concurring and dissenting.
 
 
 107
 I generally concur in the opinion of the court. I take one major exception to the opinion. The district court found that the liability of the parties should be apportioned seventy-five percent for the state and twenty-five percent for the school district, but specifically held that liability was based upon a finding of joint and several tortfeasors.
 
 
 108
 The state appealed the apportionment of liability to this court. However, it has never appealed the district court's original judgment of joint and several liability. I do not fault counsel because it would be difficult absent a divisible injury under traditional legal principles to dispute the validity of such a holding.
 
 
 109
 This court's opinion has appropriately discussed how the state has "so narrowly circumscribe[d] KCMSD's duty to raise money" and that as a partial result therefrom it is a practical reality that the school district cannot fully contribute to the funding of the remedial program to meet constitutional compliance. Under the circumstances traditional legal principles apply. I would simply hold that under a judgment of joint and several liability that upon failure of one tortfeasor to comply with the judgment because of financial inability to fund the remedial plan that any other tortfeasor may be liable for the whole. As the Supreme Court indicated in Edmonds, cited in the court's opinion, quoting from the Second Restatement of Torts:
 
 
 110
 A tortfeasor is not relieved of liability for the entire harm he caused just because another's negligence was also a factor in effecting the injury. "Nor are the damages against him diminished." Restatement, [Second] supra, Sec. 879, Comment a. Likewise, under traditional tort law, a plaintiff obtaining a judgment against more than one concurrent tortfeasor may satisfy it against any one of them. Id., Sec. 886. A concurrent tortfeasor generally may seek contribution from another, id., Sec. 886A, but he is not relieved from liability for the entire damages even when the nondefendant tortfeasor is immune from liability. Id., Sec. 880. These principles, of course, are inapplicable where the injury is divisible and the causation of each part can be separately assigned to each tortfeasor. Id., Secs. 433A(1) and 881.
 
 
 111
 Edmonds, 443 U.S. at 260-61 n. 8, 99 S.Ct. at 2756 n. 8.
 
 
 112
 I do not doubt the constitutional authority of the district court as approved in Liddell VII to exercise the remedial order necessary to bring about constitutional compliance. However, a judicial decree requiring increase in local levies on real estate and the imposition of a property tax should "be exercised only after exploration of every other fiscal alternative." Liddell VII, 731 F.2d at 1320. Thus, I do not feel that it was necessary for the district court or feasible for this court to approve a property tax levy by KCMSD to meet its fiscal responsibility. Where other alternatives remain, it is the very essence of judicial restraint not to go beyond the relief necessary. The State of Missouri should therefore pay for any amount KCMSD is unable to contribute, failing existing means by KCMSD to raise the monies in order to effectuate constitutional compliance. The state may under existing law seek contributions from the KCMSD but this problem is between the parties and not for the court. I therefore would set aside the property tax levy ordered by the district court and use existing legal principles to effect constitutional compliance by holding the state liable for any deficiency KCMSD cannot contribute under the plan.
 
 ON REHEARING EN BANC
 
 113
 BOWMAN, Circuit Judge, joined by WOLLMAN, Circuit Judge, dissenting from the denial of rehearing en banc.
 
 
 114
 This is a case of exceptional importance. The remedies ordered go far beyond anything previously seen in a school desegregation case. The sheer immensity of the programs encompassed by the district court's order--the large number of magnet schools and the quantity of capital renovations and new construction--are concededly without parallel in any other school district in the country. Similarly, in no other case has federal judicial power been used to imposes a tax increase in order to provide funding for a desegregation remedy.
 
 
 115
 In addition, the case presents the overarching question of whether these court-ordered programs and court-ordered taxes are Constitutionally required in order to rectify the vestigial effects of legally mandated segregation (dead now for over thirty years) or instead represent an unsupportable exercise of judicial power in a legislative-style attempt to solve social problems that have their origins in other causes.
 
 
 116
 In over five years on the bench, I have not seen a case more deserving than this one of thoughtful consideration by the entire Court. The decision as it stands appears to arrogate to the federal judiciary vast powers that under the Tenth Amendment are reserved to the states or to the people. I therefore regret that a majority of the Court has voted to deny the petitions for rehearing en banc.
 
 
 
 [1]
 The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri
 
 
 [2]
 This appeal raises the propriety of some thirteen district court orders: those of June 16 and November 12, 1986, April 29, July 6, August 19, August 24, September 15, October 27, and November 13, 16, and 23, 1987, January 7, 1988, and March 1, 1988
 
 
 [3]
 The principal orders instituting the magnet schools plan were that of June 16, 1986, calling for expenditure of $12,972,727, of which the state was liable for $6,665,634, slip op. at 19; and November 12, 1986, calling for expenditure of $142,736,025, of which the State was solely liable for $89,877,724 and jointly and severally liable with KCMSD for the remainder. Slip op. at 6
 
 
 [4]
 The court ordered expenditure of $12,877,330 for capital improvements in its order of June 16, 1986, all of which was to be paid by the State, slip op. at 15; $52,858,301 in its order of November 12, 1986, for which the State and KCMSD were jointly and severally liable, slip op. at 5; $7,376,135 in its order of April 29, 1987, for which the State and KCMSD were jointly and severally liable, slip op. at 3; $353,061 in its order of July 7, 1987, slip op. at 12; and $187,450,334 in its order of September 15, 1987, for which the State and KCMSD were jointly and severally liable, with equal contribution, 672 F.Supp. at 408. Capital improvements ordered earlier have already been affirmed. Jenkins I, 807 F.2d at 685
 
 
 [5]
 We asked the parties to provide agreed upon statistics for the number of children residing in the KCMSD who attend private schools, but they were unable to do so. Nevertheless, we are able to take notice of census figures on this subject for the City of Kansas City, though we realize its boundaries are not coterminous with those of the KCMSD. Census figures for 1980 show that about 17 percent of the school age children in Kansas City, Missouri are in private schools. U.S. Dept. of Commerce, Bureau of the Census, 1980 Census of Population, General Social and Economic Characteristics, Missouri 27-12 (1983). They further indicate that about 71 percent of the total Kansas City, Missouri population is white, U.S. Dept. of Commerce, Bureau of the Census, 1980 Census of Population and Housing, Advance Estimates of Social, Economic and Housing Characteristics, Missouri 27-61 (1983), and that about 60 percent (56,486) of the children ages 5-18 in Kansas City are white and about 37 percent (34,874) are black, see U.S. Dept. of Commerce, Bureau of the Census, 1980 Census of Population, General Population Characteristics, Missouri 27-54 (1982). The record in this case indicates that the KCMSD enrollment was approximately 68.3 percent black in 1985. See Order of June 14, 1985, slip op. at 31
 
 
 [6]
 The State also attacks the goals of the capital improvements plan. Since the capital improvements plan serves the same remedial goals as the magnet school plan, our magnet school discussion answers the State's arguments
 
 
 [7]
 The Jenkins class argues that there was systematic refusal by taxpayers to vote levy increases or bond issues "dating from precisely the moment when the school district became majority black." Jenkins Brief at 20. They further argue that the black wards tended to give highest voter percentages in favor of revenue measures. The record tends to support these arguments, but as the district court did not base its findings of fact and conclusions of liability on this theory, we need say no more
 
 
 [8]
 We recognize that the Supreme Court has on a number of occasions commented on the lack of precedential value of such denials. See generally L. Stern, E. Gressman & S. Shapiro, Supreme Court Practice (6th ed. 1987) Sec. 5.7. On the other hand, we have earlier commented that such denials "cannot be overlooked." Wells v. Meyer's Bakery, 561 F.2d 1268, 1275 (8th Cir.1977)
 
 
 [9]
 With respect to the capital improvement plan the district court found that because the improvements have a useful life of 30 to 50 years, the costs should be shared evenly. 672 F.Supp. at 408
 
 
 [10]
 Briefs opposing the taxes were filed by the United States; a group of Kansas City area taxpayers who are paying the newly ordered taxes; the State of Kansas, whose argument was directed only to the income tax surcharge; the Washington Legal Foundation, Senator John Danforth, and two members of the Missouri House of Representatives; 56 rural Missouri school districts; the Missouri Association of Rural Educators, whose argument attacked primarily the scope of the relief ordered and the amount of state funds diverted to the district by the court's order; and the National Association of Independent Insurers, which objected only to the income tax surcharge imposed on insurance premiums received from business conducted in the KCMSD area. Briefs supporting the taxes were filed by the Lawyers Committee for Civil Rights, the NAACP, and the Civic Council of Greater Kansas City
 
 
 [11]
 The bonds require an annual debt service for principal and interest of approximately $14.9 million per year
 
 
 [12]
 See footnotes 16 and 20, infra
 
 
 [13]
 The court in Liddell VII found further support for its reasoning in a number of Supreme Court decisions ordering municipalities to levy and collect taxes for satisfying their contractual obligations, and rejecting arguments that state law restrictions on the power to tax prevented them from doing so. 731 F.2d at 1322. The court also relied on numerous decisions based on state law that municipalities may not avoid their liability in tort by pleading constitutional or statutory debt limitations. Id
 
 
 [14]
 Like Evans, 582 F.2d at 780, Plaquemines Parish School Bd. v. United States, 415 F.2d 817, 833-34 (5th Cir.1969), which is also cited by the State, recognized and upheld the power of the district court to enter an injunction requiring the State to make funds available to the school board to pay for the desegregation plan drawn by the district court
 
 
 [15]
 The amici point to the opinions of dissenting judges in Liddell VII. We must first observe that the entire court, including the dissenting judges, is bound by this court's en banc decision in Liddell VII. Further, the dissents did not imply that a district court should be left powerless to enforce remedial orders, as the amici propose. See, e.g., 731 F.2d at 1332 (Gibson, J., concurring and dissenting)
 
 
 [16]
 Levy increases were also submitted on February 4, 1986, August 5, 1986, November 4, 1986, and March 31, 1987, the last three containing separately submitted issues for earmarked usage such as salary increases, bond retirement, and desegregation expenses. Only one of the eight submitted issues required approval by two-thirds, but all failed of passage
 
 
 [17]
 The statute provides exclusions for sales tax revenue attributable to pupils residing on federal lands, and an amount necessary to maintain the commissions of county officials and county funds under Mo.Rev.Stat. Sec. 50.338 (1986). The statute also provides that if a district fails to reduce its operating levy in compliance with this section, state aid under Mo.Rev.Stat. Sec. 163.031 (1986) will be reduced in an equivalent amount
 
 
 [18]
 We recognize that there may be some circumstances in which the district court could justifiably find that KCMSD did not have sufficient resources to fully fund the apportionment we have affirmed today of the desegregative costs, and if it so finds, we do not preclude the district court from placing the remainder of the burden on the State. See Part V, Section D, supra, and footnote 21. It is our intent that KCMSD contribute its share, subject to these considerations
 
 
 [19]
 Heretofore the State of Missouri has seen fit to place no limitations on its income tax revenue; it is payable into the general treasury of the State
 
 
 [20]
 Legislation was introduced in the 1987 session of the House of Representatives, H.B. 757, to give school districts the authority to impose a sales tax up to 1/2 cent on individual earnings and business profits tax on residents and non-residents earning income or profits within the district and/or a surcharge of up to 25 percent on residents' state income tax, increasing the present tax rate from 6 percent to 7.5 percent. Further, any such tax increases could be approved by a simple majority. The KCMSD board proposed and supported this legislation. The legislation failed
 
 
 [21]
 While we have rejected the argument urged by a number of the amici and adopted by the dissent that under this principle all costs should be borne by the State, the State does have an obligation to pay any required sums which are beyond the capacity of the school district
 
 
 [22]
 The district court also denied the applications of the county and the Clark group for permissive intervention, but these rulings have not been appealed
 
 
 [23]
 We are also satisfied that if the district court erred in denying intervention, the error was harmless. The district court granted members of the Clark group permission to participate as amici, and they have filed an amicus brief with this court challenging the funding orders and have participated in oral argument. The taxpayers have thus been granted the opportunity to challenge the funding orders, see Arkansas Elec. Energy, 772 F.2d at 404, and their challenge is based on questions of law which they can adequately present as amici, see Blake v. Pallan, 554 F.2d 947, 955 (9th Cir.1977). The county has simply failed to overcome the presumption that its interests are adequately represented by the State. See, e.g., Environmental Defense Fund v. Higginson, 631 F.2d 738, 740 (D.C.Cir.1979) (per curiam)